## Schneider v. Schneider
### [Cite as 7 AOA 202]

Case No. WD-89-38
Wood County, (6th)
Decided September 14, 1990

John L. Straub, for Appellant.

Jay E. Feldstein, for Appellee.

ABOOD, J.

This is an appeal from a judgment of the Wood County Court of Common Pleas, Domestic Relations Division, which granted plaintiff-appellant a decree of divorce, ordered a division of the marital assets which had not been previously divided by stipulation of the parties and awarded appellant sustenance alimony. Appellant has filed a timely notice of appeal setting forth two assignments of error:

"FIRST ASSIGNMENT OF ERROR
THE LUCAS COUNTY COURT OF COMMON PLEAS ERRED IN FINDING THAT PROPER VENUE FOR THIS ACTION LAY ONLY IN WOOD COUNTY AND IN TRANSFERRING THE CAUSE FROM LUCAS COUNTY TO WOOD COUNTY.

"SECOND ASSIGNMENT OF ERROR
UNDER THE FACTS AND CIRCUMSTANCES OF THIS CASE, THE TRIAL COURT COMMITTED AN ABUSE OF DISCRETION IN FAILING TO MAKE AN AWARD OF PERMANENT ALIMONY FOR AN INDEFINITE PERIOD OF TIME."

The facts that are relevant to the issues on appeal are as follows. The parties were married on June 22, 1967, in Maumee, Ohio; two children were born to the marriage. (As of the date of the trial the older child had attained majority and the younger child was in the fifth grade.) On January 22, 1987, appellant filed a complaint for divorce in the Domestic Relations Division of the Lucas County Court of Common Pleas in which she alleged that appellee had conducted activity in Lucas County which gave rise to her claim for relief, alleged that appellee was guilty of gross neglect of duty and extreme cruelty and requested that the marriage be terminated and that she be awarded custody of the minor children, a reasonable division of the marital property and permanent alimony. At the time appellee filed for divorce, both parties resided in Wood County. On February 9, 1987, appellee filed a motion to dismiss for improper venue pursuant to Civ. R. 12(B) (3) in which he argued that Lucas County was an improper forum for the action and, therefore, the cause of action was not properly before the trial court. On March 10, 1987, the parties agreed to submit the venue issue to the trial court for decision on the following stipulated facts:

"1. Defendant and another woman have been seen in public:

"(a) At Loma Linda's restaurant in Lucas County, Ohio in January; 1986 and again in May, 1986;

"(b) At Portside in Lucas County, Ohio during a Party in the Park in the month of June, 1986;

"(c) At Someplace Else restaurant in Lucas County, Ohio in October, 1986;

"2. Plaintiff and defendant have been living separate and apart since June, 1985;

"3. Defendant's relationship with the 'other woman developed a few months before the parties separated in June, 1985;

"4. The woman with whom defendant has been seen resides in Lucas County and was a co-employee of defendant until mid-July, 1986;

"5. Notwithstanding the separation of the parties, defendant has continued to contribute to the support of plaintiff and the minor children;

"6. Plaintiff first consulted with her attorney in December, 1985 and defendant first consulted with his attorney in March, 1986;

"7. The foregoing facts are the only legally relevant connection between the parties and the venue of this action in Lucas County, Ohio."

On March 11, 1987, the referee filed his report which found that Wood County, not Lucas County, was the proper venue for the action and recommended that the case be transferred to the Wood County Court of Common Pleas for further proceedings. On March 24, 1987, appellant filed a notice of objections to the referee's report and a motion for rehearing. Appellee filed a memorandum in opposition to appellant's objections and on April 28, 1987, the trial court filed its judgment entry in which it affirmed and adopted the referee's findings of fact and recommendations of law and ordered the case transferred to the Wood County Court of Common Pleas. On August 31, 1987, appellee filed his answer and counterclaim for divorce alleging that the parties had been living separate and apart continuously without cohabitation for greater than one year. On September 15, 1987, appellant filed a reply to appellee's counterclaim for divorce. On January 8, 1988, appellee filed a motion for physical examination of appellant which motion was granted and on January 27, 1988, appellant was examined by Dr. Stephen Farber at appellee's costs. On February 10, 1988, the final hearing was held and testimony was taken.

At the final hearing, Nancy Kahler, a friend of both parties, testified that she had seen appellee at Loma Linda's Restaurant in February 1986, in the company of two women, one of whom appellee admitted to being his girlfriend.

Appellant then testified that she had known since February 28, 1985, that appellee had had a girlfriend but that she and appellee had attempted to keep their marriage together despite that fact; appellee, however, refused to give up his girlfriend, and appellant could not handle that situation. Appellant testified that appellee had moved out of the marital home in June 1985, and that since he had left he had provided her with money to maintain the residence and to support the children and herself. Appellant went on to testify that in 1958, when she was a teenager, she had had one leg amputated below the knee due to congenital problems and had been fitted with an artificial limb. At the time of the final hearing, appellant was approximately forty-four years old, had graduated from Bowling Green State University in 1966 and had a teaching degree. Appellant testified that she had taught school for several years until, in the fall of 1968, she and appellee agreed that she would quit working due to problems with ulcers on her amputated leg caused by heat aggravation and by being on her feet so much. After she quit full-time teaching, she did do some substitute teaching but when she became pregnant and developed problems with her pregnancy, she quit that as well. Appellant testified that she did not work outside of the home again until 1985 when she discovered that appellee was having an affair. At that time, appellant obtained employment as a receptionist for a podiatrist working six hours a day, four days a week for $3.50 an hour. In 1987, that employment was reduced to two days a week, and she took a second part-time position with Ferrel Construction Company as a typist earning $5.50 an hour. Appellant testified that, in September 1987, she quit both temporary jobs and became employed with Statewide Information Systems, first as a typist and filer for three days a week, and is currently a data collector four days a week at $4.50 an hour. Appellant stated that she can only handle working four days because she is exhausted by Thursday evening due to her health problems. Appellant testified that in 1977 she was diagnosed as having rheumatoid arthritis and suffered stiffness in her joints, specifically her shoulders, knuckles, foot, hands and wrists. Appellant testified that, in addition to physical therapy, she is currently being treated with what are known as first line drugs, which include a special arthritic aspirin called Cama, but that her treating doctors have recommended treatment with second line drugs, which are stronger and which include gold treatments. Appellant testified, however, that she is reluctant to start gold treatments due to her fear of side effects and the fact that it would antagonize her stomach ulcer. Appellant also testified that her mother had had rheumatoid arthritis and had severe problems with the side effects of second line treatments. Appellant admitted that if she took the gold, the infection, pain and swelling would probably decrease and she would perhaps be able to work full-time but that there were no guarantees and the treatment would not take away her arthritis. Appellant testified that she has some difficulty in her present

employment due to her arthritic condition and since June 1985 her condition has deteriorated rapidly resulting in crippling in her hands and her left foot making it difficult to file and to write for long periods of time. Appellant also testified that it is hard to move in the mornings but due to the flexibility in her job she can go in late and work late. Appellant also testified as to problems with her left knee cap slipping. Finally, appellant testified that she has recently been recertified for primary teaching but has not contemplated or sought full-time employment since she feels it is too physically demanding given her conditions. Appellant testified that she has to have a maid clean her house, but can drive and grocery shop herself although she needs help carrying the bags. Appellant stated that she cannot use the phone for long periods of time but, other than these problems, she feels she leads a fairly normal life. Appellant testified that her gross pay is approximately $120 a week, netting $100 a week and that her monthly expenses average approximately $2,500.

At the time of the hearing, appellee was approximately forty-seven years old and in good health. Appellee testified that he had graduated from Bowling Green with a Bachelors Degree in 1966 and had been employed by Champion Spark Plug for fifteen years when he was laid off. Appellant subsequently attempted to start his own business, financing it with his retirement benefits and by a second mortgage on their home; however, the business fell through and he lost the money. Appellant testified that he is currently working at Pilliod Cabinet Company in Swanton, Ohio, and grosses approximately $62,500 a year, netting $3,550 a month, which amount increases approximately $390 a month from October through December. Appellant testified that his monthly expenses are approximately $1,517 for himself and $456 for college expenses for his older son. Appellee testified that while he was living with appellant, their life was relatively normal but with some periods of difficulty. He stated that her arthritis was not as severe as it seems to be now and that her principal problems then were with her leg. He testified that her condition has degenerated since he left. Appellee stated that when he left home he paid to appellant for her support approximately $2,500 a month for the first year, then $2,100 a month until the time that their older son went away to college and finally $1,800 a month up until the time of trial. He testified that he was more than willing to pay alimony in an amount that was fair.

Other evidence before the trial court was the deposition testimony of Dr. Michael Gordon, Dr. Stephen Farber and Mr. Carlton Smith. Dr. Gordon testified that he had treated appellant from December 1985 to the present on a semi-regular basis. Gordon testified that on her first visit in December 1985, appellant's condition, due to the rheumatoid arthritis, consisted of swelling in her hands, wrists, elbows, shoulders, left knee and foot. At that time, Gordon immediately recommended that she begin treatment with second level remittive, anti-inflammatory agents such as gold. Gordon testified that appellant indicated to him that she was fearful of taking remittive drugs since her mother had been treated with them prior to her death. As to the side effects of gold treatments, Gordon testified that they included effects on bone marrow, a decrease in the white and red blood cell count, increased risk of infection, decrease in blood platelet count and toxicity to the kidneys. Gordon indicated, however, that if side effects did develop, when the medication was stopped they would go away and only on rare occasions were they not reversible. Gordon testified that he saw appellant again in April 1986 and that at that time she had increased inflammation, especially in her knuckles, and he again recommended remittive agents for treatment, but appellant said that she was not yet ready to start on the gold treatments. Gordon then testified that the gold treatments were seventy to seventy-five percent effective in arresting the arthritis or achieving a partial remission, although they could not completely cure the swelling and the inflammation, and that only twenty-five to thirty percent of the people using the treatments did not respond at all or experienced toxic reactions. Gordon testified that he next saw appellant in January 1987 and, again, she had increased swelling in her hands and wrists. Gordon testified that when he saw her in May 1987 she was experiencing continued problems with her hands, wrists, elbows and foot and he told appellant that at the rate she was going she would end up with significant deterioration in her joints if she did not start his suggested treatment. Gordon testified that her condition from December 1985 to March 1987 had deteriorated, that the disease was more progressive with more joints involved and that she was losing more mobility in her hands. Gordon testified that, in his

opinion, hers was an aggressive disease and not responsive to treatments so far, placing her in the category of patients who end up with a certain amount of crippling and deformity over a period of time if the disease continued unchecked. He noted a downward progression in her condition over the previous two years and that she definitely needed the second line of remittive drugs. As to her employability, Gordon testified that it would be difficult for her to work without the suggested treatment especially if her work required much use of her hands and arms. Gordon testified that, even if she received the treatment and it was effective, there was already a fair amount of damage and she may progress to the point at which she would not be able to work at all. He testified that he was unable to predict future employability and that she had done better than the vast majority of the people with her disease of whom approximately eighty percent would probably not have been working in her condition.

Also before the court was the deposition testimony of Dr. Stephen Farber who had examined appellant at appellee's request. Farber testified that appellant had had progressive arthritis for the previous ten years, had not been treated with as strong a drug as recommended and, therefore, her disease was progressive and destructive and that she experienced significant pain, stiffness and swelling in her joints including her shoulders, right elbow, both wrists, hands, knee and ankle, with decreasing stability and strength in closing her hand and movement in her shoulders. Farber testified that he did not believe appellant could continue working without stronger treatment and that if her disease remained untreated it would become more rapidly damaging and, within several years, she would be significantly disabled. Farber testified, however, that if she was treated as recommended it is likely that she could maintain her employment doing light work such as office or clerical work with limited hand function, gripping, lifting and weight bearing. He testified that she perhaps could teach school but would be limited in non-teaching duties such as decorating classrooms. Farber also recommended treatment with the stronger second and even third line drugs. Farber projected that within the next five to ten years, appellant's ability to get up, wash, dress and feed herself in the morning would be limited even with the stronger treatment and that she would not be occupationally functional.

Finally, there was the deposition testimony of Carlton Smith, a consultant with the Ohio Education Association. Smith testified as to the accessibility of public schools to the handicapped and the assistance available to handicapped students and, perhaps, teachers. Smith did testify, however, that he had no knowledge as to the hiring possibilities for a handicapped teacher since he represented only those who were already teachers.

On November 7, 1988, the referee issued his report and recommendations. The referee noted, *inter alia,* that corroborated testimony had been received that the defendant had been guilty of gross neglect of duty and extreme cruelty towards plaintiff and recommended that she be granted a divorce from the defendant. As to appellant's physical condition, the referee found:

"9. That the Plaintiff is a forty-four-year-old woman who is not in particularly good health. Her right leg was amputated in 1958, and she uses a prosthesis. She has throughout the years experienced difficulty as a result of her use of the prosthesis, namely, with ulcers due to rubbing and hot, humid weather. Plaintiff also has rheumatoid arthritis. This condition, together with her amputation makes mobility a particular problem for the Plaintiff. She has a good deal of trouble with stairs, cannot lift much weight, and cannot stay in any one position for a long period of time.

"10. That the Plaintiff was first diagnosed with arthritis in 1977. She has since that time sought out medical treatment and has received treatment. She has been advised by at least two doctors that her condition has developed such that she should obtain what is referred to as the second line of drugs for treatment of the arthritis. This line of drugs is essentially gold treatment; that is, gold is injected into the body. Such treatment causes the slowing of the degenerative nature of the disease and may cause remission. This obviously would allow for less pain and increased mobility. Other more potent drugs could be administered as well. All of these treatments have some side effects usually related to increase risk of infection due to a lowering of the body's immune system. Statistically speaking, however, the Plaintiff would have a seventy-five to ninety percent chance of having a remission in the disease if she would consent to any of these more potent line of treatment.

"11. That the Plaintiff has thus far refused to escalate her treatment of the disease due to an understandable, but unreasonable fear that if she receives the gold treatment, she will get leukemia as her mother did when her mother, who was similarly afflicted, was treated with gold. The weight of the medical opinion seems to see no connection between the two.

"12. That the Plaintiff is a certified primary school teacher. She is presently employed as a secretary/receptionist and works part time, six to eight hours a day, four days a week. She has been offered employment of five days a week, but has rejected it due to being exhausted due to the combined effect of the problems with her leg and the arthritis. The Plaintiff has not yet actively sought out employment as a teacher, although that appears to be her design as she only recently became recertified."

The referee went on to propose a recommended distribution of the remaining marital assets. The referee found:

"19. With regard to the other property at issue, it should be split on a fifty/fifty basis. To effectuate such a division, Plaintiff shall be awarded all the shares of Champion stock and fifty percent of Defendant's 401(K) retirement plan. Defendant shall be awarded all the life insurance policies and their present cash value.

"20. That the parties' 1987 joint tax refund shall be divided evenly between the parties.

"21. That the parties' minor child is eleven years old and is a fifth grader in St. Rose's Elementary School in Perrysburg. Plaintiff desires that the child remain in that school through the eighth grade. So as not to further disrupt this child's life, this would be appropriate. The tuition is present [sic] $62 per month. That it would be appropriate that the Defendant, with the far greater resources, shall bear this expense, in addition to his child support obligation until the child finishes the eighth grade. After completion of the eighth grade, Defendant shall have no further obligation to pay for any private school tuition for this child.

"22. Given the above property division and all the testimony received both through deposition and in court, that if the Plaintiff received the more potent treatment of her disease that she could very likely again become employed as a teacher and earn substantially more than she is presently earning. That given this, the Plaintiff is not necessarily entitled to an indefinite award of sustenance alimony, but is definitely in need of sustenance alimony in the next few years. The Court recognizes that the Plaintiff's ability to earn a great deal in the first few years is unlikely and that she is likely, if she elects to step up her treatment, to have greater medical expenses initially. The Court also notes that the minor child should be emancipated in 1995. Recognizing this, it would be appropriate that alimony be paid to the Plaintiff for at least one year beyond that time so that the Plaintiff is not faced with the prospect of having to be totally self-supporting while having to 'buy out' Defendant's interest in the marital home if she desires to remain in the home.

"23. That taking into consideration the Plaintiff's expenses that she has claimed (minus the school tuition expenses), and the Defendant's income and expenses, that the Defendant should pay as and for sustenance alimony the sum of $1,400 per month for one year starting November 1988. For the following year, Defendant shall pay $1,200 per month as and for sustenance alimony. For the next year and every year thereafter, for the next six years, Defendant shall pay $1,000 per month as and for sustenance alimony. At the conclusion of eight years, the Defendant's obligation to pay alimony shall cease unless sooner terminated by the Plaintiff's death, remarriage or cohabitation with an unrelated male. During the eight year period, this alimony shall be modifiable by either party upon a showing of a substantial change of circumstances."

Appellant filed a motion for new trial on January 12, 1989, and a supplemental motion for new trial on February 3, 1989. On February 7, 1989, appellee filed a memorandum in opposition to plaintiff's supplemental motion for a new trial. Appellant's motion for new trial was denied and on February 23, 1989, the trial court entered its judgment entry of divorce, in which it affirmed and adopted the findings of fact and recommendations of the referee. It is from this judgment that appellant has filed a timely notice of appeal.

In her first assignment of error, appellant asserts that the trial court erred in finding that the proper venue for this action lay only in Wood County since the venue provisions of Civ. R. 3(B) (1) through (9) are equal alternatives and one is not more proper than another. Appellant argues that she has a right to chose which of the multiple cites she wishes to use and the evidence before the trial court clearly demonstrated that appellee conducted activity in Lucas County which constituted extreme cruelty

and gross neglect and gave rise to her cause of action for divorce.

Appellee responds that the only factors that are relevant to the venue issue are those as set forth in the stipulation of facts filed on March 10, 1987, and that those facts, standing alone, do not constitute extreme cruelty and gross neglect of duty so as to invoke Civ. R. 3(B) (3).

Civ. R. 3(B) (3) provides, in pertinent part:

"(B) Venue: where proper. Any action may be venued, commenced and decided in any court in any county. When applied to county and municipal courts 'county' as used in this rule shall be construed where appropriate, as the territorial limits of those courts. Proper venue lies in any one or more of the following:

"(1) The county in which the defendant resides;

"***

"(3) A county in which the defendant conducted activity which gave rise to the claim for relief;

"***

"(9) In actions for divorce, annulment or for alimony in the county in which the plaintiff is and has been a resident for at least ninety days immediately preceding the filing of the complaint;"

The eleven subsections of Civ. R. 3(B) are disjunctive and, therefore, have equal status and any court specified therein may be a proper and initial place of venue. See *Wise v. Wise* (1983), 8 Ohio App. 3d 243; *Fuller v. Fuller* (1972), 32 Ohio App. 2d 303.

In her complaint appellant alleged that appellee had been guilty of gross neglect of duty and extreme cruelty towards plaintiff and that appellee had conducted activity in Lucas County which gives rise to her claim for relief. In her argument in support of proper venue in Lucas County, appellant argues that the conduct which gives rise to her claim for relief is the fact that the parties had been separated and that appellee had been seen three times in public with another woman.

In *Verplatse v. Verplatse* (1984), 17 Ohio App. 3d 99, 100, the Third District Court of Appeals discussed what constituted extreme cruelty stating:

"The term 'extreme cruelty' as used in R.C. 3105.01 is not limited in scope to acts of physical violence or the reasonable apprehension thereof, but is sufficiently broad to encompass acts and conduct the effect of which is calculated to permanently destroy the peace of mind

and happiness of one of the parties to the marriage and thereby render the marital relationship intolerable. *Buess v. Buess* (1950), 89 Ohio App. 37 [45 O.O. 331].

"The determination of what facts constitute extreme cruelty in a given case must be left to the broad, but sound, discretion of the trial court and whether sufficient evidence has been presented to establish extreme cruelty will depend upon all the circumstances of the particular case. 48 Ohio Jurisprudence 3d (1983) 272, Family Law, Section 1126."

Upon consideration of the stipulated facts as set forth above, which was the only evidence that was before the trial court on the issue of venue, this court finds that these limited facts do not require a finding that appellant's cause of action for divorce on the basis of extreme cruelty and gross neglect of duty arose in Lucas County, particularly where both parties resided in Wood County and the overall relationship of the parties is clearly based in that county. Therefore, we cannot say that the trial court abused its discretion in finding that these facts do not constitute gross neglect of duty and extreme cruelty and erred in finding that venue was not proper in Lucas County. Accordingly, appellant's first assignment of error is found not well-taken.

In her second assignment of error, appellant asserts that the trial court abused its discretion in setting the amount of the alimony and in failing to make that alimony award permanent or for an indefinite period of time. Appellant argues that an award of sustenance alimony is based upon need and the trial court has wide latitude in examining all of the evidence before it in formulating an award that is reasonable and equitable to both parties. Appellant also asserts that, although the trial court's findings of fact are for the most part accurate, there are several areas in which the testimony was misconstrued. Appellant argues that the amount of the sustenance alimony award, which gradually decreases over eight years and then terminates, is not supported by the evidence and that, based upon the facts in the record and the equities, the alimony award, both in amount and duration, was arbitrary, unreasonable and unconscionable. Appellant argues further that the trial court also erred in not retaining jurisdiction to modify the award after the eight-year period.

Appellee responds that appellant is arguing questions of fact and not issues of law and,

since appellant failed to file any written objections to the referee's report pursuant to Civ. R. 53(E), she may not now assign as error the court's adoption of the referee's findings of fact. Appellee argues that the issue of whether or not alimony should be terminated after eight years was a question of fact to be made by the trier of fact and that the appellate court must affirm the findings of fact if there is any evidence at all in the record upon which the findings can be based. Finally, appellee argues that the trial court made the order modifiable within the eight-year period and therefore appellant has adequate protection to seek additional money and that the trial court's decision to reduce the alimony is within its discretion.

Civ. R. 53(E) (6) provides:

"(6) Factual findings. A party may not assign as error the court's adoption of a referee's finding of fact unless an objection to that finding is contained in that party's written objections to the referee's report. The court may adopt any finding of fact in the referee's report without further consideration unless the party who objects to that finding supports that objection with a copy of all relevant portions of the transcript from the referee s hearing or an affidavit about evidence submitted to the referee if no transcript is available. In deciding whether to adopt a referee's findings of fact, the court may disregard any evidence which was not submitted to the referee unless the complaining party demonstrates that with reasonable diligence he or she could not have discovered and produced that evidence for the referee's consideration."

However, Civ. R. 53(E) (5) provides:

"(5) When effective. The report of a referee shall be effective and binding only when approved and entered as a matter of record by the court. The referee's findings of fact must be sufficient for the court to make an independent analysis of the issues and to apply appropriate rules of law in reaching a judgment order. *The court may adopt the referee's recommendations about appropriate conclusions of law and the appropriate resolution of any issues. However, the court shall determine whether there is any error of law or other defect on the face of the referee's report even if no party objects to such an error or defect.* The court shall enter its own judgment on the issues submitted for action and report by the referee." (Emphasis added.)

In accordance therewith, this court finds that appellant has waived objection to the specific *findings of fact* made by the referee and subsequently adopted by the trial court by failing to file objections in that court within fourteen days after the filing of the referee's report pursuant to Civ. R. 53(E) (2) and (6). To the extent, however, that in this assignment of error appellant is challenging the ultimate legal conclusions reached by the trial court in its award of sustenance alimony, her objections have not been waived. Civ. R. 53(E) (5). Even though this court may not disturb the referee's findings of fact, it is our responsibility under this assignment of error to examine the entire record to determine whether or not the trial court failed to correctly apply the law in exercising its discretion and arriving at its award of sustenance alimony.

This court in its opinion in *Powell v. Powell* (1989), 49 Ohio App. 3d 56, determined that:

"Upon the granting of a divorce, the trial court must determine what award of alimony, which may include an equitable division of the marital assets as well as periodic payments for sustenance and support, is appropriate. *Cherry v. Cherry* (1981), 66 Ohio St. 2d 348, 20 O.O. 3d 318, 421 N.E. 2d 1293; *Teeter v. Teeter* (1985), 18 Ohio St. 2d 76, 18 OBR 1106, 479 N.E. 2d 890. The trial court is given broad discretion in determining the appropriate scope of these awards based on the particular facts and circumstances of each case, and such determination will not be disturbed by this court absent an affirmative showing that the trial court abused its discretion. *Cherry, supra; Teeter, supra.* The term 'abuse of discretion' implies the trial court's attitude was unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St. 3d 217, 5 OBR 481, 450 N.E. 2d 1130."

Once the division of property is made, the trial court then must consider whether an additional amount is needed for sustenance alimony and the duration of such necessity. *Kaechele v. Kaechele* (1988), 35 Ohio St. 3d 93. In making its award of sustenance alimony, the trial court must consider all the factors set forth in R.C. 3105.18(B)[1] and not base its decision upon any one of these factors in isolation. *Id.*

As to the duration of an alimony award, this court in *Koepke v. Koepke* (1983), 12 Ohio App. 3d 80, held at syllabus:

"While, in the vast majority of cases, an award of alimony for sustenance and support should provide for the termination of the award upon a date certain so as to provide the parties

with an ascertainable limit upon their rights and liabilities, in certain circumstances, such awards would be inequitable and would work an undue hardship upon the recoverer of the award or upon the payor. In such circumstances, the trial court may, in the proper exercise of its discretion, award alimony terminable only upon certain contingencies, such as the death or remarriage of the recoverer of the award of alimony or further order of the court."

When reviewing all of the evidence in the record, including the findings of fact set forth by the referee and adopted by the trial court, the transcript of the proceedings held below, the deposition testimony and the exhibits, it is clear that, given her current condition and her future prognosis, appellant's ability to find employment as a teacher and thereby increase her current income is, at best, speculative. Her future employability is unpredictable and dependent upon a number of uncertain factors such as whether or not she elects to take a stronger treatment for her arthritis and, if she does, whether the stronger treatment will be effective and, if it is, to what extent it will stabilize her condition and enable her to handle employment as a teacher, if she can find such employment, and for how long she will be employable at all, given the aggressive nature of her disease. In light of these extreme circumstances coupled with the duration of the marriage, appellant's age, appellee's earning ability, the standard of living enjoyed by the parties while they were married, the retirement benefits of both parties, appellant's contribution as a homemaker and the relative assets and liabilities of each, this court finds that the alimony award is inequitable and the trial court clearly failed to correctly apply the law as set forth above in exercising its discretion and ordering alimony for a limited duration in a decreasing amount and in failing to retain jurisdiction to modify the award at the conclusion of the eight years. This court finds further that, given the circumstances and equities as they exist herein, a proper alimony award would not automatically decrease and would be for an indefinite period subject to future modification by the trial court so that in the event that appellant does elect stronger treatment which proves successful and enables her to increase her earning abilities, the trial court can modify the award and achieve a result that is equitable to both parties. Accordingly, appellant's second assignment of error is found well-taken.

Upon consideration whereof, this court finds that substantial justice has not been done the party complaining and the decision of the Wood County Court of Common Pleas, Domestic Relations Division, is affirmed, in part, and reversed, in part. This cause is remanded to the trial court for further proceedings not inconsistent with this opinion. Costs to appellee.

*Judgment affirmed in part,*
*and reversed in part.*

HANDWORK, P.J., GLASSER, J., and ABOOD, J., concur.

---

[1] "§ 3105.18. Alimony.

"(B) In determining whether alimony is necessary, and in determining the nature, amount, and manner of payment of alimony, the court shall consider all relevant factors, including, but not limited to, the following:

"(1) The relative earning abilities of the parties;

"(2) The ages, and the physical and emotional conditions of the parties;

"(3) The retirement benefits of the parties;

"(4) The expectancies and inheritances of the parties;

"(5) The duration of the marriage;

"(6) The extent to which it would be inappropriate for a party, because he will be custodian of a minor child of the marriage, to seek employment outside the home;

"(7) The standard of living of the parties established during the marriage;

"(8) The relative extent of education of the parties;

"(9) The relative assets and liabilities of the parties;

"(10) The property brought to the marriage by either party;

"(11) The contribution of a spouse as homemaker."